773 S.E.2d 627

TUG VALLEY PHARMACY, LLC; B & K Pharmacies, Inc. d/b/a Family Pharmacy; Strosnider Drug Store, Inc. d/b/a Sav-Rite Pharmacy; and Dr. Diane Shafer Defendants Below, Petitioners

v.

ALL PLAINTIFFS BELOW IN MINGO COUNTY Civil Action Nos. 10-C-251, 11-C-332, 12-C-38, 10-C-252, 10-C-319, 12-C-39, 12-C-35, and 11-C-370, Plaintiffs Below, Respondents.

No. 14-0144.

Supreme Court of Appeals of West Virginia.

Submitted March 4, 2015.

Decided May 13, 2015.

Concurring Opinion of Justice Benjamin May 28, 2015.

284

Michael M. Fisher, Esq., Elizabeth S. Cimino, Esq., Jackson Kelly PLLC, Charleston, West Virginia, for Tug Valley Pharmacy, LLC, Samuel Randolph Ballengee, and, B & K Pharmacies, Inc., d/b/a Family, Pharmacy.

David F. Nelson, Esq., Hendrickson & Long, PLLC, Charleston, West Virginia, for Strosnider Drug Store, Inc. d/b/a, Sav–Rite Pharmacy.

Cecil C. Varney, Esq., Williamson, West Virginia, for Diane Shafer, M.D.

James M. Cagle, Esq., Charleston, West Virginia, for Respondents.

WORKMAN, Chief Justice:

This case is before the Court upon certified questions presented by the Circuit Court of Mingo County regarding whether the respondents/plaintiffs below (hereinafter "respondents") in the cases below may maintain causes of action against the petitioners/defendants below (hereinafter "petitioners") for allegedly causing or contributing to respondents' addiction to controlled substances, where respondents admit to engaging in criminal conduct associated with their acquisition and abuse of the controlled substances. Petitioners maintain that, as a result of respondents' admitted criminal conduct, their actions are barred entirely by the "wrongful conduct" rule and/or the doctrine of *in pari delicto*.

■ Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we conclude that any wrongdoing on the part of the respondents must be assessed under our long-standing precepts of comparative negligence and does not *per se* operate as a complete bar to their causes of action. Accordingly, we answer the first certified question in the affirmative and decline to answer the second certified question as it is mooted by the Court's response to the first certified question.[1]

## I. FACTS AND PROCEDURAL HISTORY

The twenty-nine individual respondents[2] filed a total of eight separate civil actions in the Circuit Court of Mingo County, alleging that the petitioners and others negligently prescribed and dispensed controlled substances causing respondents to become addicted to and abuse the controlled substances. The suits were filed against several different combinations of the three petitioner pharmacies—Tug Valley Pharmacy, Strosnider Drug Store, and B & K Pharmacies—the Mountain Medical Center, and four physicians working at the Mountain Medical Center—Drs. Victorino Teleron, William Ryck-

1.  " 'In a certified case, this Court will not consider certified questions not necessary to a decision of the case.' Syllabus Point 6, *West Virginia Water Serv. Co. v. Cunningham*, 143 W.Va. 1, 98 S.E.2d 891 (1957)." Syl. Pt. 7, *Shell v. Metropolitan Life Ins. Co.*, 181 W.Va. 16, 380 S.E.2d 183 (1989).

2.  Thirty-three individuals initially filed suit; four apparently did not pursue their claims. Twenty-six of the respondents appear to be individual drug users and/or their representatives, while three appear to merely assert derivative claims.

man, Katherine Hoover, and petitioner Dr. Diane Shafer.[3]

Respondents were patients of the Mountain Medical Center and its physicians, most of them purportedly seeking treatment as the result of auto accidents or workplace injuries. In the course of their "treatment" at the Mountain Medical Center, respondents were prescribed controlled substances, including Lortab, Oxycontin and Xanax, which they filled at the petitioner pharmacies and to which they allege that they became addicted, allegedly resulting in their admitted criminal abuse of the prescriptions and criminal activity associated with obtaining the drugs, as more particularly described *infra*. Ultimately, the Mountain Medical Center and their physicians were the subjects of an FBI raid which revealed violations of federal and state law for improperly prescribing controlled substances.[4] Certain of the physicians' medical licenses were revoked and some pled guilty to and served time for the federal offenses. Of the petitioner pharmacies, only Strosnider and its pharmacist, James Wooley, were subject to disciplinary and/or criminal action. Neither B & K nor Tug Valley were subject to discipline.

Most, if not all, of the respondents admit that their abuse of controlled substances predated their "treatment" at Mountain Medical and even the existence of some of the petitioner pharmacies. All of the respondents admitted to engaging in most, if not all, of the following illegal activities associated with the prescription and dispensation of controlled substances while being provided services by the petitioners: criminal possession of pain medications; criminal distribution, purchase, and receipt of pain medications ("off the street"); criminally acquiring and obtaining narcotics through misrepresentation, fraud, forgery, deception, and subterfuge (not advising doctors of addiction or receipt of narcotics from other doctors); criminally obtaining narcotics from multiple

doctors concurrently (commonly known as "doctor shopping"); and abusing and/or misusing pain medication by ingesting greater amounts than prescribed and snorting or injecting the medications to enhance their effects. Notably, during depositions conducted in the underlying cases, virtually all of the respondents asserted their Fifth Amendment privilege against self-incrimination, refusing to answer questions about other sources from whom they obtained controlled substances who were not licensed physicians.

Respondents, however, maintain that the medical providers acted "in concert" with the petitioner pharmacies, which pharmacies were well aware of the so-called "pill mill" activities of the medical providers. Respondents contend that the petitioner pharmacies refilled the controlled substances too early, refilled them for excessive periods of time, filled contraindicated controlled substances, and filled "synergistic" controlled substances which would provide an enhancing effect to the drugs. Moreover, respondents contend that the sheer volume of business derived from the "pill mill" facilities and physicians suggests an awareness of and joint endeavor in the improper activities of the medical providers.

On the basis of respondents' admissions of their own criminal activity associated with the prescription and dispensation of controlled substances by petitioners, petitioners moved for summary judgment asserting that respondents' claims were barred as a matter of law. In particular, respondents invoked the "wrongful conduct rule" as adopted in other jurisdictions, which stands for the proposition that a plaintiff may not recover when his or her unlawful conduct or immoral act caused or contributed to the injuries. *See, e.g., Orzel v. Scott Drug Co.*, 449 Mich. 550, 537 N.W.2d 208 (1995). Alternatively, petitioners argued that the doctrine of "*in pari delicto*" ("in equal fault") bars recovery. The circuit court concluded that the actions

3. Only the petitioner pharmacies and Dr. Diane Shafer are participants in the proceedings before this Court.

4. Evidence adduced below indicates that the Mountain Medical Center saw approximately 175 patients per day. Between the years of 2002 and 2010, Katherine Hoover was the highest prescri-

ber of controlled substances to the effect of 355,-132 prescriptions for controlled substances in West Virginia alone. However, we note that the appendix record on appeal is somewhat piecemeal and derived, in part, from newspaper articles of varying degrees of readability.

were not barred, but ordered that the following questions be certified to this Court pursuant to the Uniform Certification of Questions of Law Act, West Virginia Code § 51–1A–3 (1996) (2008 Repl. Vol.):

1) May a person maintain an action if, in order to establish the cause of action, the person must rely, in whole or in part, on an illegal or immoral act or transaction to which the person is a party?

2) May the doctrine of *in pari delicto* be employed as a bar to tort claims under West Virginia law?

## II. STANDARD OF REVIEW

■ It is well-established that "[t]he appellate standard of review of questions of law

answered and certified by a circuit court is *de novo*." Syl. Pt. 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996). With this standard in mind, we proceed to the issues presented.

## III. DISCUSSION

Simply put, these certified questions require the Court to determine whether it will adopt the "wrongful conduct rule"[5] adopted or codified[6] in some jurisdictions. This Court has not, contrary to the petitioners' contention, implicitly endorsed the wrongful conduct rule and has made only passing reference to the companion *in pari delicto* doctrine.[7] Petitioners argue that this Court should adopt a wrongful conduct bar which

---

**5.** The rule is also occasionally referred to as the "unlawful acts doctrine" or "serious misconduct doctrine."

**6.** Many states have adopted statutory iterations of the rule including Alaska, California, Florida, Louisiana, Ohio, Oregon, and Texas. *See* Alaska Stat. § 09.65.210 (1997) ("A person who suffers personal injury or death or the person's personal representative under AS 09.55.570 or 09.55.580 may not recover damages for the personal injury or death if the injury or death occurred while the person was ... engaged in the commission of a felony, the person has been convicted of the felony, including conviction based on a guilty plea or plea of nolo contendere, and the party defending against the claim proves by clear and convincing evidence that the felony substantially contributed to the personal injury or death[.]"); Cal. Civ.Code § 3333.3 (West 1997) ("In any action for damages based on negligence, a person may not recover any damages if the plaintiff's injuries were in any way proximately caused by the plaintiff's commission of any felony, or immediate flight therefrom, and the plaintiff has been duly convicted of that felony."); Fla. Stat. § 776.085 (1996) ("It shall be a defense to any action for damages for personal injury or wrongful death, or for injury to property, that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony."); La.Rev.Stat. Ann. § 9:2800.10 (1996) ("No person shall be liable for damages for injury, death, or loss sustained by a perpetrator of a felony offense during the commission of the offense or while fleeing the scene of the offense."); Ohio Rev.Code Ann. § 2307.60 (West 2008) ("Recovery on a claim for relief in a tort action is barred to any person or the person's legal representative if any of the following apply: The person has been convicted of or has pleaded guilty to a felony, or to a misdemeanor that is an offense of violence, arising out of criminal conduct that was a proximate

cause of the injury or loss for which relief is claimed in the tort action."); Or.Rev.Stat. § 31.180 (1997) ("Felonious conduct of plaintiff as complete defense in tort actions"); Tex. Civ. Prac. & Rem.Code Ann. § 86.002(a) (West 1997) ("A claimant who has been convicted of a felony or misdemeanor may not recover damages for an injury sustained during the commission of the felony or misdemeanor if the injury would not have been sustained but for the commission of the felony or misdemeanor.").

We are cognizant of and expressly note that in its most recent session, our Legislature enacted a similar statute which would bar recovery for a plaintiff whose damages "arise out of the plaintiff's commission, attempt to commit or fleeing from the commission of a felony criminal act insofar as the plaintiff is convicted of the felony." H.B. 2002, 2015 Leg. 82nd Sess. (W.Va. 2015) (effective May 25, 2015). However, the instant certified question, which asks this Court to adopt a common law version of the wrongful conduct rule, is unaffected by this enactment which is not yet effective as of the date this case was submitted to the Court or this opinion. *Cf. Dugger v. Arredondo*, 408 S.W.3d 825 (Tex.2013) (analyzing potential availability of common law "unlawful acts doctrine" irrespective of availability of statutory affirmative defense to similar effect). The effect of this statute is simply not before the Court.

**7.** While of similar origins, the doctrine discussed under the rubric of *"in pari delicto"* is typically reserved for contractual or transactional disputes, as opposed to tort claims. In fact, that is the lone context in which this Court has spoken to the principle. In *Workman v. Lewis*, 126 W.Va. 6, 28 S.E.2d 56 (1943), the Court briefly discussed *in pari delicto* in addressing an allegedly fraudulent transaction regarding an indebtedness. Beyond this scant discussion, this Court has not addressed the doctrine.

would bar entirely a claim where a plaintiff must rely on his or her illegal or immoral act to establish the cause of action. Respondents counter that such a rule merely rewards defendants' own wrongful and tortious conduct and that a plaintiff's conduct must be assessed according to our comparative fault concepts. We will examine the merits of each position in turn.

## A. The Wrongful Conduct Rule

The modern statement of the wrongful conduct rule urged by petitioners is contained in *Orzel*, as follows: "A person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." 537 N.W.2d at 212 (citations omitted); *see also Greenwald v. Van Handel*, 311 Conn. 370, 88 A.3d 467, 472 (2014) (recognizing rule that a plaintiff "cannot maintain a tort action for injuries that are sustained as the direct result of his or her knowing and intentional participation in a criminal act."). The rationale typically argued in support of the rule is the "public policy that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct." *Orzel*, 537 N.W.2d at 213; *see also Rimert v. Mortell*, 680 N.E.2d 867, 874 (Ind.Ct.App.1997) (wrongful conduct rule "embodies the principle that one who is responsible for the commission of a criminal or wrongful act must exclusively bear his or her share of the responsibility for the act, and may not evade that responsibility either through gaining some profit for the act or shifting liability for the act to another"). There are four commonly cited reasons for barring such claims: 1) to avoid "condon[ing] and encourag[ing] illegal conduct"; 2) to prevent wrongdoers from profiting from their illegal acts; 3) to avoid damage to the public's perception of the legal system; and 4) preventing wrongdoers from shifting responsibility for their illegal acts to other parties. *Orzel*, 537 N.W.2d at 213; *see also Greenwald*, 88 A.3d at 477 ("[A]id is denied despite the defendant's wrong ... to maintain re-

spect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination.").

Critics of the rule have deemed it "slippery and vexing," and have focused on the difficulty in formulating a comprehensive rule and its potential abuse or *ad hoc* application.[8] Moreover, courts dealing with this "controversial" rule have struggled to cohesively define what qualifies as "serious" misconduct such as to bar relief. *Dugger*, 408 S.W.3d at 839 (Hecht, J., dissenting). One commentator has noted that since "moral offensiveness is a patently subjective notion," application of the rule requires the court to "evaluate the plaintiff's conduct through a moral prism trained on an ever changing social landscape and climate[.]" King, *supra* note 8, at 1051, 1076. More importantly, however, it has been observed that once a flaccid rule is articulated, the rule essentially permits the court to substitute its judgment for that of the traditional fact-finder—the jury—and therefore "may also invite judges to vent their moral sensibilities or react to anticipated public indignation based on the moral flavor of the month." *Id.* at 1072–73; *see also Dugger*, 408 S.W.3d at 841 (Hecht, J., dissenting) (recognizing that "[o]ne criticism of the unlawful acts doctrine, a criticism with substance, is that it does not have sufficient limiting principles").

Courts adopting the wrongful conduct rule have engaged in wide-ranging attempts to curb potential abuse or misapplication of the rule by requiring a high degree of causality between the wrongful conduct and the plaintiff's injury. In *Price v. Purdue Pharma Co.*, 920 So.2d 479, 485 (Miss.2006), the court attempted to articulate the required nexus by stating that "[w]here the violation of law is merely a *condition* and not a *contributing cause* of the injury, a recovery may be permitted." (quoting *Meador v. Hotel Grover*, 193 Miss. 392, 9 So.2d 782, 786 (1942) (emphasis added)). The *Price* court echoed the common, but hollow, sentiment that plaintiff's claim is barred only if he "actually requires

---

**8.** *See Joseph H. King Jr., "Outlaws and Outlier Doctrines: The Serious Misconduct Bar in Tort Law," 43 Wm. & Mary L.Rev. 1011, 1076 (2002); see also Robert A. Prentice, "Of Tort Reform and*

*Millionaire Muggers: Should an Obscure Equitable Doctrine be Revived to Dent the Litigation Crisis?" 32 San Diego L.Rev. 53 (1995).*

essential aid from his own illegal act to establish a claim[.]" *Id.* The scope and particulars of "essential aid" were not further enunciated.

Likewise grappling with a meaningful expression of the required degree of causal connection between the wrongful conduct and the injuries, some courts have broadly stated merely that such injuries must be a "direct result" of the wrongful conduct. *See Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.,* 621 So.2d 953, 955 (Ala.1993); *Barker v. Kallash,* 63 N.Y.2d 19, 479 N.Y.S.2d 201, 468 N.E.2d 39, 41 (1984). Recognizing perhaps that such a description does little to aid in application of the rule, the *Orzel* court attempted to put a finer point on this vague incantation by stating that such claims are not barred where the act is "merely incidentally or collaterally connected with the cause of action[.]" 537 N.W.2d at 215 (citations omitted). The *Orzel* court further offered the following eloquent, yet unedifying, encapsulation: "The unlawful act must be at once the source of both his criminal responsibility and his civil right." *Id.* at 215 (quoting *Manning v. Bishop of Marquette,* 345 Mich. 130, 76 N.W.2d 75, 78 (1956)). These efforts to toss additional verbiage at the rule to control its application have proven fairly unsatisfying. *See* King, *supra* note 8, at 1050 ("The facile words of the courts are no less satisfactory despite their confident, reassuring tone.").

In addition to the difficulty in meaningfully articulating the degree of causal connection required between the wrongful conduct and the injuries, the nature of the "wrongful conduct" required to implicate the rule has also been variably characterized. For example, the *Oden* court restricted its rule to bar actions for injuries resulting from "the injured party's knowing and intentional participation in a *crime involving moral turpitude.*" 621 So.2d at 955 (emphasis added). In *Barker,* the court held that "when the plaintiff has engaged in activities *prohibited,* as opposed to merely *regulated,* by law, the courts will not entertain the suit[.]" 479 N.Y.S.2d 201, 468 N.E.2d at 41 (emphasis added). However, the *Orzel* court held that the conduct must be "prohibited or *almost entirely* prohibited under a penal or criminal

statute" as opposed to a "violation of a safety statute, such as traffic and speed laws or requirements for a safe work place" since such conduct does not "rise to the level of serious misconduct[.]" 537 N.W.2d at 214 (emphasis added).

Additionally, like most rules, the wrongful conduct rule is not immune to categorical exceptions. Many courts have found the rule inapplicable where 1) there is "inequality" between the parties such as where "plaintiff has acted ' "under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age" ' " or 2) there is a statutory basis for recovery. *Orzel,* 537 N.W.2d at 217–18 (citations omitted); *see also Rimert,* 680 N.E.2d at 874–75 (recognizing that "prohibition against imposing liability for one's own criminal acts to another through a civil action is simply not justified when a plaintiff is not responsible for the act or acts in question."); *O'Brien v. Bruscato,* 289 Ga. 739, 715 S.E.2d 120 (2011) (finding fact question of whether plaintiff knowingly committed a wrongful act precluded application of wrongful conduct rule); *Lee v. Nationwide Mut. Ins. Co.,* 255 Va. 279, 497 S.E.2d 328, 329 (1998) (holding wrongful conduct defense "will be applied to bar recovery if the evidence shows that the plaintiff freely and voluntarily consented to participation in the illegal act, without duress or coercion").

In addition to the criticisms that the rule lacks "lucid, predictable, or workable standards," the purported justifications for the rule identified at the outset have also been deemed suspect. King, *supra* note 8, at 1017. First, the suggestion that the absence of such a rule allows a plaintiff to "profit" from his wrongdoing is misguided; if a plaintiff is injured as the result of someone's negligence, merely obtaining compensation for his loss does not constitute "profit." Secondly, the idea that precluding personal injury suits by those who engage in criminal conduct serves as a deterrent to such conduct lacks credulity. If the criminal penalties for such activity are insufficient, it is highly unlikely that such individuals will be deterred by the inability to bring a civil suit in the event they are injured and are further unlikely to appreciate any risk to themselves

in participating in the criminal activity in the first instance.

■ Furthermore, the fear that the public will find recovery by those who engage in criminal conduct "unseemly" is a dangerous premise for adoption of the wrongful conduct rule. This notion is based upon the antiquated conceit that "[n]o polluted hand shall touch the pure fountains of justice." *Collins v. Blantern,* 2 Wils. 341, 350, 95 Eng. Rep. 847, 852 (K.B. 1765). However, as one commentator observed, "this rationale ignores the countervailing contamination potential when the bar operates to confer immunity on an equally bad tortfeasor." King, *supra* note 8, at 1048; *see also* Prentice, *supra* note 8, at 122 ("[T]he moral characteristics of the parties before a court have little or no relevance to that court's capacity to do justice or injustice."). Our duty is to the rule of law, not public opinion. The archaic notion that the judicial system is unavailable to so-called "outlaws" has long-ago been supplanted by the concept of comparative fault, which plainly permits those with "polluted hands" to access justice in accord with the findings of the jury. The adoption of comparative fault further undermines the final rationale that the wrongful conduct rule must be utilized to prohibit the "shifting" of a wrongdoer's responsibility—the allocation of relative fault prevents inequitable "shifting" of personal responsibility.

The less-than-satisfying formulations of the rule and tenuous policy rationales notwithstanding, the broad concept of the wrongful conduct rule is, admittedly, superficially appealing. This Court is not so obtuse as to be unaware of the facially offensive premise that admitted criminal drug abusers should abdicate responsibility for their illegal conduct and make such conduct a source of income. Certainly this Court has, for the last thirty-six years, staunchly agreed with and adhered to the notion that "where a party substantially contributes to his own damages, he should not be permitted to recover for any part of them." *Bradley v.*

*Appalachian Power Co.,* 163 W.Va. 332, 341, 256 S.E.2d 879, 885 (1979). In fact, this concept is the basis of the Court's adoption of the modified comparative fault rule barring recovery for individuals who contribute fifty percent or more to their own injuries, as discussed more fully *infra.*[9]

However, as illustrated above, an attempt to transmute this concept into a *per se* "wrongful conduct" bar, subject to myriad considerations as to the type of conduct, causality of such conduct, and wholesale exceptions to application of the rule, nearly serves to obliterate the rule altogether: a sort of judicial "black hole" where the rule essentially collapses on itself. At best, attempting to accommodate all factual scenarios and policy concerns raised by the wrongful conduct rule make it virtually impossible to comprehensively articulate and therefore highly unlikely to be judiciously applied. In short, the wrongful conduct rule is "worse than an unruly horse; it is an imaginary one." Prentice, *supra* note 8, at 99. We will consider, then, the alternative.

## B. The Role of Comparative Negligence

The countervailing view to adoption of the wrongful conduct rule, as advocated by respondents, posits that a plaintiff's wrongful conduct is simply a matter to be evaluated by the jury under our system of comparative negligence. Respondents contend that matters of relative wrongdoing among the parties have long been and continue to be governed by West Virginia's principles of comparative negligence as set forth in *Bradley* and therefore must be apportioned by the jury rather than presenting a complete bar to the claim. From a policy standpoint, respondents argue that applying the wrongful conduct bar to their causes of action merely serves to reward and condone the actions of petitioners, which respondents claim were equally abhorrent to public policy and, in some instances, likewise criminal.[10]

---

9. *But see* n. 11, *infra,* regarding legislative modification to West Virginia's comparative fault scheme.

10. In fact, it may reasonably be argued that wrongdoing by highly-trained, licensed professionals, charged with the grave responsibility of the health and welfare of the public, may actually be considered more abhorrent. As previously

As noted by one commentator, "[a]fter the adoption of comparative negligence ... a rule that bars the claim of the immoral plaintiff potentially conflicts with the comparative negligence system of apportionment, which would only reduce damages." 1 Dan B. Dobbs, et al, *The Law of Torts* § 228, p. 816 (2011); *see also* King, *supra* note 8, at 1022 ("[M]any jurisdictions adopting comparative fault have opted for a modified version under which a plaintiff whose fault crosses a specified threshold is completely barred, thus obviating the need to invoke an independent serious misconduct bar to achieve a clean kill of the plaintiff's claim."). Regardless, however, courts which have adopted the wrongful conduct rule have attempted to square the rule with their respective formulations of comparative negligence by reasoning that public policy prohibits the claim in the first instance, leaving no claim to which comparative fault may be applied: "[R]ecovery is denied, not because the plaintiff contributed to his injury, but because the public policy of this State generally denies judicial relief to those injured in the course of committing a serious criminal act." *Barker*, 479 N.Y.S.2d 201, 468 N.E.2d at 41. The *Barker* court further explained that "[t]he policy which applies to this case, has always existed independently from the rule of contributory negligence and its successor, comparative negligence" and that such a claim simply "[does] not demonstrate any cause of action cognizable at law" to which comparative negligence would be applicable. *Id.*, 479 N.Y.S.2d 201, 468 N.E.2d at 43–44.

In essence, these courts have concluded that "*as a matter of law,* the plaintiff's fault exceeded the defendant's." King, *supra* note 8, at 1055 (emphasis added). However, as astutely noted, "[t]his kind of logic seems little more than a stealth version of comparative fault, but with the court in control rather than the jury." *Id.* Rather than endorsing this surreptitious transfer of the fact-finding obligations, other courts have reached the conclusion that plaintiff's alleged wrongful conduct is a matter best relegated to comparative fault standards. *See Dugger*, 408

S.W.3d at 830 ("Since Texas's shift to the proportionate responsibility scheme ... most Texas courts have used a plaintiff's unlawful act to measure proportionate responsibility, and reduce recovery, rather than completely bar the plaintiff from recovering damages."); *Sonoran Desert Investigations, Inc. v. Miller*, 213 Ariz. 274, 141 P.3d 754, 761 (Ct.App. 2006) (finding that "regardless of whether [plaintiff's] antecedent conduct was criminal in nature and whether it is characterized as contributory negligence or assumption of the risk" the claim is not barred due to plaintiff's criminal activity); *see also* Restatement (Second) of Torts § 889 (1979) ("One is not barred from recovery for an interference with his legally protected interests merely because at the time of the interference he was committing a tort or a crime[.]").

As noted above, our rule of modified comparative negligence was first established by this Court in *Bradley*. The *Bradley* Court abolished our strict contributory negligence system wherein a plaintiff could not recover if he was even one percent at fault, in favor of a modified comparative negligence scheme wherein a plaintiff may recover unless his fault "equals or exceeds" the negligence of all other parties: "A party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident." Syl. Pt. 3, *id.* In discussing the inequity of a strict contributory negligence system which barred a slightly negligent plaintiff's claim outright, the Court noted: "[O]ur system of jurisprudence, while based on concepts of justice and fair play, contains an anomaly in which the slightest negligence of a plaintiff precludes any recovery and thereby excuses the defendant from the consequences of all of his negligence, however great it may be." *Id.* at 335, 256 S.E.2d at 882. Notably, the Court observed that a rule "that prohibits recovery to the plaintiff if he is at fault in the slightest degree is manifestly unfair, and in effect *rewards the substantially negligent defendant by permitting him*

---

noted, although petitioners make much of respondents' criminal conduct, petitioner Dr. Diane Shafer and pharmacist James Wooley were

subjected to federal criminal charges, unlike most of the respondents as based upon the appendix record presented.

*to escape any responsibility for his negligence."* *Id.* at 341–42, 256 S.E.2d at 885 (emphasis added).

Since that time, the comparative fault concept has remained unchanged in West Virginia [11] and has in fact subsumed a great number of doctrines which, like the wrongful conduct rule, operated as a complete bar to plaintiff's recovery. *See Ratlief v. Yokum,* 167 W.Va. 779, 280 S.E.2d 584 (1981) (last clear chance); *King v. Kayak Mfg. Corp.,* 182 W.Va. 276, 387 S.E.2d 511 (1989) (assumption of risk); *Moran v. Atha Trucking, Inc.,* 208 W.Va. 379, 540 S.E.2d 903 (1997) (sudden emergency).[12] As this Court observed in *Moran,* "the adoption of the comparative negligence rule meant that some well-settled tort doctrines developed in response to contributory negligence must now be modified or fall by the wayside altogether." 208 W.Va. at 385, 540 S.E.2d at 909; *accord Dugger,* 408 S.W.3d at 832 ("Proportionate responsibility abrogated former common law doctrines that barred a plaintiff's recovery because of the plaintiff's conduct—like assumption of the risk, imminent peril, and last clear chance—in favor of submission of a question on proportionate responsibility.").[13]

The doctrine most similar to the wrongful conduct rule urged by the petitioners which ultimately gave way to a comparative fault analysis is assumption of risk. In Syllabus Point 2 of *King,* the Court eliminated the "complete bar" effect of assumption of risk, making it merely an aspect of comparative fault to be determined by the jury: "A plaintiff is not barred from recovery by the doctrine of assumption of risk unless his degree of fault arising therefrom equals or exceeds the combined fault or negligence of the other parties to the accident." 182 W.Va. 276, 387 S.E.2d 511. Similar to the criminal conduct

at issue herein, the Court noted that assumption of risk was not mere carelessness, rather it was "venturousness": *"Knowledge* and *appreciation of the danger* are necessary elements of assumption of risk." 182 W.Va. at 280–81, 387 S.E.2d at 515–16 (quoting Syl. Pt. 5, *Spurlin v. Nardo,* 145 W.Va. 408, 417, 114 S.E.2d 913, 919 (1960)) (emphasis added). Like conduct subject to attack under "assumption of risk," immoral or illegal conduct certainly has the same earmarks of knowledge, willfulness, and appreciation of danger; the actor proceeds irrespective of the foolishness or illegality, respectively, of his or her conduct. This Court has made plain that such conduct does not bar the claim, but is to be considered by the jury and managed through the apportionment of fault.

Accordingly, this Court finds that our system of comparative negligence offers the most legally sound and well-reasoned approach to dealing with a plaintiff who has engaged in immoral or illegal conduct. We find that in cases where a plaintiff has engaged in allegedly immoral or criminal acts, the jury must consider the nature of those actions, the cause of those actions, and the extent to which such acts contributed to their injuries, for purposes of assessment of comparative fault. These are highly factual inquiries, all of which require the jury's venerable analysis and respected consideration. In the instant case, there is an obvious threshold factual question which perfectly illustrates the potential inequity in applying a wrongful conduct bar: did the respondents suffer from pre-existing addiction and abuse of controlled substances which was merely enabled and perpetuated by the petitioners' alleged conduct or was their addiction to and abuse of the controlled substances *a result* of

---

11. *But see* House Bill 2002, 2015 Leg. 82nd Sess. (W.Va. 2015) (effective May 25, 2015) (to be codified at West Virginia Code §§ 55–7–13a through 13d) (modifying West Virginia's comparative fault scheme to bar recovery only where plaintiff's fault is *greater* than the combined fault of all other persons responsible for the damages).

12. *See also Hersh v. E–T Enterprises, Ltd. Partnership,* 232 W.Va. 305, 752 S.E.2d 336 (2013), *superseded by statute,* Senate Bill 13, 2015 Leg. 82nd Sess. (W.Va. 2015) (to be codified at West Virginia Code § 55–7–27) (open and obvious).

13. Even certain privileges, such as self-defense, which permit otherwise arguably criminal conduct, are subject to a jury's determination that such conduct was reasonable. *See Collins v. Bennett,* 199 W.Va. 624, 628, 486 S.E.2d 793, 797 (1997) ("[A] person who reasonably apprehends bodily harm by another is privileged under our law to exercise reasonable force to repel the battery. The amount of force used in defense must not be excessive and must be reasonable in relation to the perceived threat.").

the petitioners' conduct? *See Cowan Brothers, L.L.C. v. American State Bank*, 743 N.W.2d 411, 419 (S.D.2007) (refusing to bar claim where plaintiffs assert their "alleged illegal acts are *a result of* the tortious con-·duct of [defendants]" (emphasis added)). These are complex factual issues that are not resolved by simply placing a "bad actor" tag on each of the parties and washing the courts' hands of the matter.

More importantly, it seems plain to this Court that "a broad unlawful acts doctrine could allow people who commit serious tortious conduct against others to have civil immunity merely because the claimant was not in compliance with every law at the time of the tortious conduct." *Dugger*, 408 S.W.3d at 835–36. We find untenable the complete vindication of such alleged tortious conduct simply because plaintiff's conduct may have in some, as-yet-undetermined degree, contributed to his or her injuries. In advocating a wrongful conduct bar, this Court is set with the Hobson's choice of which conduct we greater prefer to deter— the immoral plaintiff or the tortious (perhaps egregiously so) defendant: "[W]here the injury arises directly out of the criminal wrongdoing, the key question is which approach will better deter criminal activity: (a) barring plaintiff's recovery, thereby encouraging *plaintiff* to obey the law, or (b) permitting plaintiff's recovery, thereby encouraging *defendant* to obey the law?" Prentice, *supra* note 8, at 112 (emphasis added). Relegating such determinations to our long-standing comparative fault system obviates the need for such a choice and leaves to the jury, fully versed on the facts and inter-relationship between the wrongful actors, the decision as to which conduct it, as a society, prefers to discourage.

■ Importantly, however, our rejection of the wrongful conduct rule in no way undermines our long-held principle that a plaintiff who substantially contributes to his own injuries cannot recover. Rather, our refusal

to adopt the wrongful conduct rule simply venerates the well-established principle that

> "[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them."

Syl. Pt. 6, *McAllister v. Weirton Hosp. Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983) (citations omitted). Moreover, we agree that while "[f]acially deeming persons unworthy may assuage the sensitivities of decision makers by masking the underlying societal dynamic that engendered the conduct," such a position undermines our tort system of compensatory justice and brings us "no closer to solutions." King, *supra* note 8, at 1053. The wrongful conduct bar "allows selective resurrection of a contributory negligence defense under the cloak of the serious misconduct bar" and "legitimizes an avenue for the court to end-run the jury." *Id* at 1066, 1067–68. This Court cannot countenance a rule which "allows a defendant to profit from his own wrong in order to prevent plaintiff from profiting from hers[.]" Prentice, *supra* note 8, at 92. Such a rule connotes a lack of faith in our jury system and destabilizes our comparative fault construct which has faithfully served our State well for the last thirty-six years. Without question, our citizenry is best equipped to weigh and speak to our society's tolerance for the panoply of wrongful conduct presented herein on all sides.[14]

■ Accordingly, we hold that a plaintiff's immoral or wrongful conduct does not serve as a common law bar to his or her recovery for injuries or damages incurred as a result of the tortious conduct of another. Unless otherwise provided at law, a plaintiff's conduct must be assessed in accordance with our principles of comparative fault. We there-

---

14. We are not unmindful of petitioners' concerns regarding respondents' assertion of their Fifth Amendment privilege against self-incrimination and problems of proof occasioned thereby. However, we find that this is an issue to be managed in the trial court's discretion commen-surate .with this Court's admonitions regarding the invocation of Fifth Amendment privilege in the context of a civil matter. *See State ex rel. Myers v. Sanders*, 206 W.Va. 544, 526 S.E.2d 320 (1999).

fore answer the first certified question in the affirmative.

## IV. CONCLUSION

For the reasons set forth hereinabove, we answer the first certified question in the affirmative.

Certified Question Answered.

Justice BENJAMIN concurs and reserves the right to file a concurring opinion.

Justices KETCHUM and LOUGHRY dissent and reserve the right to file dissenting opinions.

Justice KETCHUM dissenting:

I dissent because criminals should not be allowed to use our judicial system to profit from their criminal activity. The twenty-nine plaintiffs in the present matter have admitted to engaging in the following criminal conduct: criminal possession of pain medications; criminal distribution, purchase and receipt of pain medications; criminally acquiring and obtaining narcotics through misrepresentation, fraud, forgery, deception, and subterfuge (not advising doctors of addiction or receipt of narcotics from other doctors); criminally obtaining narcotics from multiple doctors; and abusing and/or misusing pain medication by ingesting greater amounts than prescribed and snorting or injecting medications to enhance their effects.

Despite this litany of criminal misconduct, the majority ruled that these criminal plaintiffs may maintain tort actions against pharmacies and doctors who, the plaintiffs allege, *negligently or recklessly* prescribed and dispensed controlled substances to them. Further, the plaintiffs allege that the defendants *negligently or recklessly* caused them to become addicted to these controlled substances. The plaintiffs do not allege criminal or intentional conduct on the part of the defendant pharmacies and doctors. If the plaintiffs' complaints alleged criminal or intentional conduct, the defendant pharmacies and doctors would not be covered by their liability insurance policies.

1. *See* footnote 6 of the majority opinion.

The majority's ruling permitting criminal plaintiffs to maintain these civil lawsuits ignores common sense and will encourage other criminals to file similar lawsuits in an attempt to profit from their criminal behavior. I strongly disagree with this ruling and believe that this Court should adopt the wrongful conduct rule to prevent criminals from making a mockery of our judicial system by attempting to profit from their criminal activity.

The wrongful conduct rule has been adopted in a number of other states.[1] The Michigan Supreme Court of Appeals adopted the rule and described it as follows: "[A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party." *Orzel v. Scott Drug Co.*, 449 Mich. 550, 537 N.W.2d 208, 212 (1995). The court stated that the rationale underlying the rule is "rooted in the public policy that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct." 537 N.W.2d at 213.

The Connecticut Supreme Court recently held that a plaintiff cannot maintain a tort action for injuries that are sustained as the direct result of his or her knowing and intentional participation in a criminal act. In *Greenwald v. Van Handel*, 311 Conn. 370, 88 A.3d 467, 472 (2014), the court described the negative consequences that would result from allowing criminal plaintiffs to profit from their criminal conduct:

If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct.... Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties.... [W]here the plaintiff has

engaged in illegal conduct, it should be the plaintiff's own criminal responsibility which is determinative.

*Id.,* 88 A.3d at 472–73.

In the present case, the majority addressed the reasons why other courts have adopted the wrongful conduct rule but declined to adopt the rule in West Virginia because 1) it could be difficult for courts to apply; and 2) "our system of comparative negligence offers the most legally sound and well-reasoned approach to dealing with a plaintiff who has engaged in immoral or illegal conduct."

The majority worries that "attempting to accommodate all factual scenarios and policy concerns raised by the wrongful conduct rule make it virtually impossible to comprehensively articulate and therefore highly unlikely to be judiciously applied." I disagree. The wrongful conduct rule is straightforward and requires a court to exercise its basic common sense when applying the following: a criminal plaintiff may not maintain a tort action based on injuries sustained as the direct result of his or her knowing, and intentional participation in, a criminal act. Further, assuming *arguendo* that complicated factual situations would arise in which it was unclear whether a court should apply the rule, this Court is perfectly capable of reviewing such scenarios and providing clarity on the rule's application to a particular circumstance.

Next, the majority states that we need not adopt the wrongful conduct rule and should instead rely on "our system of comparative negligence" when assessing whether a plaintiff involved in immoral or illegal conduct should be allowed to maintain a civil action arising from such conduct. This argument has been considered and rejected by other courts. For instance, the Connecticut Supreme Court considered this argument in *Greenwald* and stated:

> [W]e agree with other jurisdictions that have concluded that the mere availability of common-law or statutory comparative negligence, which permits a plaintiff to recover even if his own negligence contributed to his injuries ... does not negate

application of the wrongful conduct rule. As one court explained, comparative negligence has no application to the [wrongful conduct] rule precluding a plaintiff from recovering for injuries sustained as a direct result of his own illegal conduct of a serious nature. . . . That rule is not based on the theory that a plaintiff, with an otherwise cognizable cause of action, cannot recover for an injury to which he has contributed. . . . It rests, instead, upon the public policy consideration that the courts should not lend assistance to one who seeks compensation under the law for injuries resulting from his own acts when they involve a substantial violation of the law ... It simply means that proof of such an injury would not demonstrate any cause of action cognizable at law.

*Id.,* 88 A.3d at 476–77 (internal citation and quotation omitted).

For the foregoing reasons, I respectfully dissent.

## LOUGHRY, Justice, dissenting:

The misguided majority has determined that whether an admitted criminal drug abuser can recover civil monetary damages for the results of his or her drug abuse is a matter to be decided by a jury. Assuming all facts as alleged by the parties are true, there are no even remotely innocent victims here. Rather, there are only individuals who knowingly participated in varying degrees of criminal or grossly reckless activity. By summarily dismissing the wrongful conduct rule as unworkable, the majority's decision requires hard-working West Virginians to immerse themselves in the sordid details of the parties' enterprise in an attempt to determine who is the least culpable—a drug addict or his dealer. This exercise in abject futility stands in stark contrast to the fact that of those courts that have addressed the wrongful conduct rule, the overwhelming majority have adopted it. For these reasons, I dissent to the majority's rejection of this rule.

The wrongful conduct rule has been adopted in *thirteen* other jurisdictions.[1]

---

1. Notably, the majority cites only two cases   where the rule was rejected and, in those cases,

More specifically, Florida, Iowa, Michigan, Mississippi, and a Kentucky federal court have applied the rule to bar recovery in claims for drug addiction, as in the case at bar. *See Foister v. Purdue Pharma, L.P.,* 295 F.Supp.2d 693 (E.D.Ky.2003) (barring claim of addicted plaintiff for suit brought against narcotic manufacturers and marketers for failure to warn); *Kaminer v. Eckerd Corp. of Fla., Inc.,* 966 So.2d 452 (Fla.Dist. Ct.App.2007) (barring claim against pharmacy by estate of student who overdosed on prescription drugs); *Pappas v. Clark,* 494 N.W.2d 245 (Iowa Ct.App.1992) (barring action by wife against physician and pharmacist for husband's drug addiction); *Orzel v. Scott Drug Co.,* 449 Mich. 550, 537 N.W.2d 208 (1995) (barring suit against pharmacy for alleged negligent filling of controlled substance resulting in addiction); *Price v. Purdue Pharma Co.,* 920 So.2d 479 (Miss.2006) (barring plaintiff's claim against doctors, pharmacies, and drug manufacturers for injuries sustained as result of drug addiction).

In addition, the rule has been adopted and applied in other states where plaintiffs sought to recover for injuries received in the course of their own criminal activity. *See Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.,* 621 So.2d 953 (Ala.1993) (barring claim of estate of minor killed by vending machine that fell on him while he attempt to steal soft drinks); *Lord v. Fogcutter Bar,* 813 P.2d 660 (Alaska 1991) (barring action by plaintiff against bar for plaintiff's subsequent criminal activity); *Greenwald v. Van Handel,* 311 Conn. 370, 88 A.3d 467 (2014) (barring claim by patient against social worker for failure to treat patient's child pornography habit); *Rimert v. Mortell,* 680 N.E.2d 867 (Ind.Ct.App. 1997) (barring claim by convicted murderer's conservator against physician who released murderer from mental hospital prior to murder); *Patten v. Raddatz,* 271 Mont. 276, 895 P.2d 633 (1995) (barring negligence claims among parties who engaged in prostitution and drug abuse); *Barker v. Kallash,* 63 N.Y.2d 19, 479 N.Y.S.2d 201, 468 N.E.2d 39 (1984) (barring claim by infant who was injured while making pipe bomb against retailer who sold firecrackers from which pipe bomb was made); *Lee v. Nationwide Mut. Ins. Co.,* 255 Va. 279, 497 S.E.2d 328 (1998) (barring claim by minor injured while operating stolen car); *Feltner v. Casey Family Program,* 902 P.2d 206 (Wyo.1995) (barring claim by foster family and biological son against foster care placement program arising out of son's sexual abuse of foster child). Although failing to demonstrate any particular difficulty by these courts in applying the wrongful conduct rule, the majority nonetheless concludes that these courts struggled to apply it. I suspect these courts would be surprised to learn of the majority's unfounded conclusion.

Despite the majority's empty protestations, both the wrongful conduct rule and its rationale are easily understood and applied. As the majority notes, the court in *Oden* held that "[t]his rule promotes the desirable public policy objective of preventing those who knowingly and intentionally engage in an illegal or immoral act involving moral turpitude from imposing liability on others for the consequences of their own behavior." *Oden,* 621 So.2d at 955; *see also Rimert,* 680 N.E.2d at 874 (adopting same rule which "embodies the principle that one who is responsible for the commission of a criminal or wrongful act must exclusively bear his or her share of the responsibility for the act, and may not evade that responsibility either through gaining some profit for the act or shifting liability for the act to another."). As the *Orzel* court thoughtfully explained, such suits are barred *"not because the defendant is right,* but rather because the plaintiff, being equally wrong, has forfeited any claim to aid of the court." *Orzel,* 537 N.W.2d at 213 n. 11 (emphasis added). Indeed, there is little difficulty in agreeing with the concept that to permit recovery under such circumstances would "be illogical, would discredit the administration of justice, defy public policy and shock the most unenlightened conscience." *Imperial Kosher Catering, Inc. v. Traveler's Indemnity Co.,* 73 Mich.App. 543, 252 N.W.2d 509, 510 (1977). In the absence of a cogent

---

the rejection was based on statutory and constitutional grounds. *See Dugger v. Arredondo,* 408 S.W.3d 825 (Tex.2013); *Sonoran Desert Investigations, Inc. v. Miller,* 213 Ariz. 274, 141 P.3d 754 (Ct.App.2006).

explanation, it is unclear why the majority finds this fairly uncontroversial rationale so abhorrent.

The courts that have adopted this rule set forth clear explanations for the type of conduct that qualifies for its application. As noted by the majority, in *Price*, the court stated that the fact that a plaintiff was a lawbreaker at the time of injury was not enough to bar recovery; rather, "[t]he injury must be a proximate result of committing the illegal act" and that "[w]here the violation of law is merely a condition and not a contributing cause of the injury, a recovery may be permitted." *Price*, 920 So.2d at 485 (quoting *Meador v. Hotel Grover*, 193 Miss. 392, 9 So.2d 782, 786 (1942)). The *Price* court further explained that "[t]he question is not merely *when* the wrongdoing was done, but what *resulted* from it." *Id.* (emphasis added). Likewise, the *Greenwald* court, borrowing from the United States Supreme Court's discussion concerning the similar *in pari delicto* defense, agreed that

> [t]he court's aid is denied only when he who seeks it has violated the law *in connection with the very transaction as to which he seeks legal redress*. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination.

88 A.3d at 477 (quoting *Olmstead v. United States*, 277 U.S. 438, 484, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)). There is simply nothing so arcane or inscrutable in these explanations concerning when the wrongful conduct rule would apply that warrants the majority's wholesale rejection of the rule. In fact, this is *precisely* the type of instructive commentary that this Court adopts on a regular basis to infuse meaning and rationale to our holdings. Why the majority now finds such wording so incomprehensible is, at a minimum, suspect.

Moreover, the exceptions to the wrongful conduct rule, as identified by the majority, are well-reasoned and certainly insufficient to deny the rule's adoption. As the majority indicates, "most" rules have categorical exceptions, which neither juries, lower courts, nor this Court have demonstrated difficulty in applying. More importantly, such exceptions would have no bearing in a case such as the one *sub judice*. As previously noted, courts have adopted a common exception to the wrongful conduct rule where there is inequality between the parties, such as where "plaintiff has acted under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age." *Orzel*, 537 N.W.2d at 217 (internal citations omitted). However, the *Orzel* court refused to apply this particular exception to drug-abusing plaintiffs, like the instant respondents, because "it was John Orzel who, by his continuous illegal use of Desoxyn, caused himself to become both addicted and insane." *Id.* at 217; *see also Trotter v. Okawa*, 248 Va. 212, 445 S.E.2d 121, 123–24 (1994) (holding that wrongful conduct defense will be applied to bar recovery if evidence shows that plaintiff freely and voluntarily consented to participation in illegal act without duress or coercion).

Further, in cases where drug-addicted plaintiffs assert statutory violations by the provider or dispenser of controlled substances, the *Orzel* court found that such statutes were not intended to "confer special protection on persons ... who repeatedly and fraudulently engage in the illicit use of drugs." *Orzel*, 537 N.W.2d at 219. The court reasoned that "[o]ne of the primary purposes of these provisions is to *prevent* the illegal possession and use of controlled substances. This purpose would be inherently subverted if the courts permitted relief to illicit drug users[.]" *Id.* (emphasis added); *accord Greenwald*, 88 A.3d at 475–76; *Lord*, 813 P.2d at 663 ("The dram shop statute, however, was not intended to protect persons from the consequences of their own intentional, criminal conduct.").

If the case at bar is insufficient to illustrate the merits of adopting the wrongful conduct rule, let us examine a different scenario addressed by the United States District Court for the Southern District of West Virginia. In *Gray v. Farley*, No. 2:91–0935, 1992 WL 564130, at *1 (S.D.W.Va. Oct. 26, 1992), the defendant hired the plaintiff to

commit an arson at the defendant's residence. The plaintiff, who had a last minute change of heart, was leaving the defendant's residence without committing the arson when he was confronted by an off-duty police officer who allegedly beat him. The plaintiff, *the hired arsonist*, sued the defendant, *the individual who hired him to commit the arson*, on a premises liability theory. The plaintiff asserted that the defendant failed to maintain "reasonably safe" premises by failing to foresee that the off-duty officer might "initiat[e] an assault, battery and beating" of the plaintiff. *Id.* at *2. The federal district court, using the concepts underlying the wrongful conduct rule, granted summary judgment to the defendant and dismissed the case holding that "[o]ne who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequences of that act." *Id.* (citing *Miller v. Bennett*, 190 Va. 162, 56 S.E.2d 217 (1949)). However, under the majority's decision, summary judgment would not be appropriate on such basis and a jury would have to be empaneled to determine whether the willing arsonist was more at fault for the beating that occurred than the individual who hired him to commit the arson. It is a gross understatement to say that such a result is patently absurd, yet that is the result mandated by the majority's opinion.

Simply put, the majority has taken a nonsensical and recreant approach to its consideration of the certified question presented by the circuit court. The end result is the majority's refusal to lend the force of the judiciary to the incontrovertible public policy that criminal wrongdoers should not waste the time of the judiciary or citizenry to profit from their crimes. Instead, the majority hides behind the construct of comparative negligence and pays lip service to the considerable wisdom of the jury and its ability to properly apportion fault in such matters. Ironically, this is the same jury that the majority deems incapable of understanding and properly applying the plainly articulated wrongful conduct rule in the event material issues of fact preclude a dispositive ruling by the circuit court.

In sum, the majority seeks to have West Virginia citizens do its "dirty work," with no regard for the egregious waste of judicial time and resources, loss of earnings occasioned by citizens' jury duty, *etc.*, that such a case engenders. While the majority purports to be impervious to "public opinion," the unavoidable outrage that will most assuredly follow its decision is well-deserved. In a state where drug abuse is so prevalent and where its devastating effects are routinely seen in cases brought before this Court, it is simply unconscionable to me that the majority would permit admitted criminal drug abusers to manipulate our justice system to obtain monetary damages to further fund their abuse and addiction.

For these reasons, I respectfully dissent.

BENJAMIN, Justice, concurring:

(Filed May 28, 2015)

Bad cases can make bad law. This is a bad case. According to the parties, the plaintiffs are bad people and the defendants are bad people. Plaintiffs say defendants are "pill mills." Indeed, many have been prosecuted. Defendants say plaintiffs are common addicts who want to avoid self-responsibility, who engage in illegal conduct, and who simply want defendants to fund their future illicit drug use. It might be easy to simply decide the certified question based on gut emotions and the "badness" of the parties. However, then it would be this Court which would be engaging in "wrongful conduct."

My dissenting colleagues argue that we, as judges, should lock the courthouse doors to plaintiffs such as these. I agree that the underlying issue is one of access to our courts: When may a citizen's right to seek justice in our courts be barred and by whom? But my colleagues miss the *determinative* fact which decides this case: *The Legislature and the Governor already fully considered the policy issues related to a wrongful conduct rule and enacted a wrongful conduct rule for West Virginia while this case was pending on our docket.*[1] It's that simple.

---

1. Governor Earl Ray Tomblin signed West Virgi-

nia's version of a wrongful conduct rule, H.D.

Thus, the crucial issue in answering the certified question is whether we, as a Court, will properly defer to our sister branches on a policy matter *they* have already decided. Our job is simple: though it may not be popular, judicial conservatism compels this Court to give effect to the wisdom of the Legislature and the Governor, and answer in the affirmative.[2] In other words, we as referees should follow the rules, not make them up as we go.

Allowing a plaintiff through the courthouse door, as we are compelled to do, does not mean the plaintiff can or will recover anything. Here, I can't see how plaintiffs can recover on their claims. First, I don't believe they can avoid a dismissal of their claims based upon their refusal to answer proper discovery questions. In filing this suit, plaintiffs are obligated to follow our Rules of Civil Procedure. Refusal to do so should compel dismissal. Second, plaintiffs must satisfactorily prove to the jury proximate causation of their alleged injuries by the wrongful conduct of the defendants. I am doubtful that will happen.

A. **"It must be remembered that legislatures are the ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."[3]**—Justice Oliver Wendell Holmes.

The principles of judicial conservatism *require* us to give effect to the wisdom and consideration of our sister branches of government—the branches designed to make public policy—and not to bestow upon ourselves the role of superlegislature simply because we do not believe they went far enough. This is the very essence of our constitutional system and the democratic conception of our society.

The policy underlying judicial conservatism and deference by the courts to the legislature on policy matters was eloquently set forth by Justice Felix Frankfurter:

> As a member of this Court I am not justified in writing my private notions of policy into the Constitution, no matter how deeply I may cherish them or how mischievous I may deem their disregard. The duty of a judge who must decide which of two claims before the Court shall prevail ... is not that of the ordinary person. It can never be emphasized too much that one's own opinion about the wisdom or evil of a law should be excluded altogether when one is doing one's duty on the bench.

*W.Va. State Board of Educ. v. Barnette*, 319 U.S. 624, 647, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (Frankfurter, dissenting). Responsibility for the civil policies of the state lies with the legislature. While the wrongful conduct rule had not yet been considered by the Legislature when the circuit court considered the matter below and certified its question to this Court, such is not true for this Court's consideration of the rule. Prior to our decision in this case, the Legislature fully considered the matter, negotiated language between both houses, and established West Virginia's policy related to the wrongful conduct rule through action by a conference committee endorsed by each house.[4] It is not

---

Comm. Sub. for H.B. 2002, 82nd Sess. (W.Va. 2015), on March 5, 2015, the day after this case was argued before this court. *Infra*.

**2.** No matter how we answer the certified question, our decision will be challenged. If we answer in the affirmative, some may argue that we are now allowing addicts to misuse our civil justice system. If we answer in the negative, others will argue that we are improperly immunizing drug dealers from the consequences of their actions. Ours is not to judge to a pre-determined result, but, instead, to use the principles of judicial conservatism and defer to our sister branches on this policy matter relating to access to our court system.

**3.** *Missouri, Kansas & Texas R. Co. v. May*, 194 U.S. 267, 270, 24 S.Ct. 638, 48 L.Ed. 971 (1904).

**4.** I disagree with my colleagues on the Majority with respect to the effect of the Legislature's actions herein. While this case may involve facts which predate the Legislature's actions, the Legislature nevertheless had, by the time of this decision, now studied the wrongful conduct rule and determined West Virginia's public policy. There can be no better way to establish West Virginia' public policy regarding the rule than to study and follow the Legislature's 2015 direction. This matter comes to us as a certified question asking *us* to make this public policy decision based upon a limited record. As tempting as it may be to adopt the more activist rationale of my

the job of a judge to decide policy issues that have been settled in such a democratic fashion by elected officials absent some constitutional error in the legislative action.

## B. Our Legislature and Governor Have Already Decided This Policy Issue

In exercising proper judicial restraint and deference, we must defer to our sister branches in declining to enact a wrongful conduct rule as broad as requested here by the defendants. In the 2015 legislative session, major changes were made to West Virginia law under the heading termed, "civil justice reform," and proposed a form of wrongful conduct rule more restrictive than set forth in the certified question before us. Ultimately, after considerable negotiation

and study, the Legislature restricted its language even further and forwarded an enrolled bill containing such a rule to the Governor, who signed it on March 5, 2015.[5] As signed, West Virginia's rule requires that a plaintiff be convicted of a felony before he or she is barred from filing suit.

However one wishes to consider this issue, the fact remains that we are the third of the three branches to consider the proper wording for a wrongful conduct rule. Our Legislature and our Governor fully considered the policy implications of barring lawsuits and adopted a version of the wrongful conduct rule completely inconsistent with that advanced by defendants herein. Our duty is to accept the wisdom of the Legislature and the

---

dissenting colleagues, to do so would have this Court adopt a rule completely different from—and more restrictive than—that adopted by the Legislature. *In other words, my dissenting colleagues would bar citizens from the courts whom our legislators would not!* To ignore the clear direction of the Legislature would be absurd and disrespectful to our sister branch of government. Under no reading of the legislative action herein can *any* support be found for answering the certified question in the negative. I therefore join with the Majority to answer the certified question in the affirmative—I simply disagree with them with respect to the rationale for this decision.

5.  At the beginning of the session, two bills that related to civil justice reform were introduced in the House of Delegates and the State Senate. These bills were designated H.B. 2002 and S.B. 2, respectively. Each contained the same proposed provision for a wrongful conduct rule for West Virginia. At the time these bills were introduced, this case was pending on our public docket for this term of court.

The House of Delegates took the lead. H.B. 2002, introduced on January 14, 2015, was referred to the House Judiciary Committee. As introduced, H.B. 2002 contained a wrongful conduct rule more restrictive than that advocated by the defendants herein:

(d) In any civil action, a defendant is not liable for damages that the plaintiff suffers as a result of the negligence or gross negligence of a defendant while the plaintiff is attempting to commit, committing or fleeing from the commission of a felony criminal act.

H.B. 2002, introduced January 14, 2015, modifying *West Virginia Code* § 55-7-13d. H.B. 2002 included many other potential changes to our civil justice system, especially in the area of comparative fault. In the House Judiciary Committee, the proposed wrongful conduct rule was

further restricted by amendment, adding a provision that the plaintiff must not only have engaged in a felonious act, but also that the plaintiff have been convicted of the felonious act before he or she would to be barred from maintaining an action in our courts:

In any civil action, a defendant is not liable for damages that the plaintiff suffers as a result of the negligence or gross negligence of a defendant while the plaintiff is attempting to commit, committing or fleeing from the commission of a felony criminal act; *Provided, That the plaintiff has been convicted of such felony, or if deceased, the jury makes a finding beyond a reasonable doubt that the decedent committed such felony.*

H.B. 2002, Committee Substitute, January 21, 2015. With this language, H.B. 2002, as amended, was adopted by the House of Delegates on January 27, 2015, and was communicated to the State Senate. It was introduced in the State Senate on January 28, 2015, and was referred to the Senate Judiciary Committee. The State Senate ultimately adopted the broader (original) House version of the wrongful conduct rule, without the requirement that the plaintiff be convicted of felonious conduct. The Senate approved the broader bill on February 9, 2015.

On February 12, 2015, the matter was referred to Conference. On February 19, 2015, the Conference Committee resolved the differences in the language of the competing wrongful conduct rules by adopting the more restrictive House version, thereby requiring a conviction for felonious conduct before the rule banning access to the courts would become applicable. As amended, the enrolled version of H.B. 2002 was sent to Governor Earl Ray Tomblin on March 2, 2015, and was signed by the Governor three days later. Having been on our public docket for the January 2015 Term of court, this case was presented for oral argument before this Court on March 4, 2005.

Governor on the wrongful conduct rule and give it effect.[6]

With impassioned rhetoric, my dissenting colleagues argue that this policy question is one for judges, not legislators-in other words, my dissenting colleagues seem comfortable with the notion that referees should not just apply the rules, they should make them up too. Tempting as it might be for this Court to usurp the role of the Legislature and make such a power grab under these facts, that notion is antithetical to our judicial role. As we have previously observed,

> This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish, policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions.

Syl. pt. 2, *Huffman v. Goals Coal Co.*, 223 W.Va. 724, 679 S.E.2d 323 (2009).

I certainly understand the concerns raised by my dissenting colleagues. Let's face it, with parties such as these, it is indeed tempting, perhaps, to ignore just this once the principles of judicial conservatism and engage in a bit of judicial activism, i.e., legislating from the bench. But while such a result might certainly be received by the public as plain common-sense under these extreme facts, we cannot forget that each case we decide creates precedential authority which binds us in our future considerations of similar legal issues. The manner in which we decide this case may compel us to decide future cases in a manner less well-received by the public. As referees, it is for us to call the game under the established rules, not to make up the rules to ensure a win for the home team and acceptance by the fans.[7]

## C. The Presumption of Open Access to the Courts

There is a presumption of open access to our courts in West Virginia:

> The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

Article 3, Section 17, Constitution of West Virginia ("Courts open to all—Justice administered swiftly"). This right to access to our courts is not absolute. The presumption may be rebutted. In certain circumstances, the legislature may curtail the ability of a citizen to access West Virginia's court system. "When legislation substantially impairs a person's vested rights or severely limits existing procedural remedies permitting court adjudication, thereby implicating the certain remedy provision of the constitution, the legislation will be upheld if … the purpose of the alternation or repeal of the remedy is to eliminate or curtail a clear social or economic problem…." Syl. pt. 5, in part, *Lewis v. Canaan Valley Resorts*, 185 W.Va. 684, 408 S.E.2d 634 (1991) (discussing Skiing Responsibility Act).

The wrongful conduct rule requires us to confront our constitutional policy to provide access to our courts with our gut hesitation to aid a wrongdoer. The two salient points to be considered relating to a restriction or bar on the right to access our courts, such as implicated in a wrongful conduct rule, is that the curtailing act be legislative and that it be done for a clear public policy reason, i.e., "to eliminate or curtail a clear social or economic problem." *Id.* Here, the defendants would

235 W.Va. 577, 600–01, 775 S.E.2d 458, 481–82, 2015 WL 3386875 (filed May 20, 2015).

---

6. As recently observed by Justice Loughry, "When the founding fathers decided that separation of powers between the legislative, executive, and judicial branches of government would be a wise approach to governing, they did not contemplate that one branch of government would simply seize the powers of another because it believes that it knows better…. It is not our place to second guess the Legislature's reasons for doing so." *Hammons v. WVOIC, et al.*, No. 12–1473 (J. Loughry, dissenting), at pp. 15–16,

7. H.B. 2002, as enacted, contains a number of provisions related to civil justice reform. If the dissenters were to prevail here, thereby nullifying one of the reforms of H.B. 2002, one need not long ponder whether all other reforms contained within that bill would not likewise be subject to nullification by this Court.

have us *judicially* establish a wrongful conduct rule which is plainly inconsistent with the Rule adopted by the Legislature. Ironically enough, *that* would be "wrongful conduct" on our part.

## D. Considerations Specific to This Case

Although not related specifically to the certified question before this Court, I am concerned about a number of issues related to the maintenance of this lawsuit. These relate not only to the parties themselves, but also to aspects of this action itself. I raise these in part because of my belief that the legislature may wish at some point to amend its wrongful conduct rule.

Conceptually, a wrongful conduct rule can vary in its broadness. At its most broad, the rule could read: "A person may not maintain an action if he or she must rely in whole or in part on an illegal or *wrongful* act or transaction to which the person is a party." (Emphasis added.) Of course a wrongful act may be equated to simple negligence. At its broadest, the rule would prevent a plaintiff from bringing an action in which he or she had any fault, no matter how small. Obviously, West Virginia's jurisprudence does not support such a broad rule.

The rule requested by defendants to be judicially adopted herein is nearly as broad: "A person may not maintain an action if he or she must rely in whole or in part on an illegal or *immoral* act or transaction to which the person is a party." (Emphasis added.) Our court system, based upon notice and predictability, is not one which easily accommodates the concept "immoral act or transaction." How does one define such a term in a constitutionally-derived system? Absent a legal definition of "immoral act or transaction" to guide a judge deciding a motion to dismiss, the phrase is so broad as to probably require all cases to proceed to a jury for its determination. At a minimum, inclusion of such a phrase may lead to inconsistency in the rule's application and be an insufficient guide to trial courts attempting to use the rule. The Legislature was perhaps aware of this and other legal authorities on the topic in view of its focus exclusively on illegal conduct as a threshold for the rule's applicability.[8]

While one may point to the extreme facts of this case as a reason for the broader language advocated by defendants, it is obvious that our Legislature looked at a number of factors in codifying West Virginia's wrongful conduct rule. First, the Legislature was faced with what type of act should serve as the threshold for consideration of the rule. The types of actions which might have been considered range from felony convictions (a restrictive approach to banning access to the courts) to the much more difficult to define "immoral acts" (a much easier approach to banning access to the courts). The rule ultimately adopted by our Legislature prior to oral argument in this case goes to the more narrow or restrictive end of the spectrum. Not only would the Legislature require that a plaintiff's conduct amount to a violation of a serious law, i.e., a felony, it would also require that a plaintiff have also been convicted of such an offense. Second, the Legislature was concerned with the level of proof of an act necessary to invoke the rule. Here again, the Legislature could have opted for an easier civil preponderancy. It did not do so, however, opting for the "beyond a reasonable doubt" burden necessary for a conviction.[9]

The parties to this action are difficult to like. On the one hand, we have plaintiffs whose character defendants take every opportunity to malign. Defendants point out that all, or nearly all, of the plaintiffs have

**8.** A *See also* Restatement (Second), Torts § 889 (1979) ("One is not barred from recovery for an interference with his legally protected interests merely because at the time of the interference he was committing a tort or a crime...."). This was a carry-over of the same language from Restatement (First) of Torts § 889 (1939)

**9.** For example, the Legislature could have considered more moderate language: "In any civil action, a defendant is not liable for damages that the plaintiff suffers as a result of the negligence or gross negligence of a defendant while the plaintiff is attempting to commit, committing or fleeing from the commission of a criminal act or transaction and such act is an integral and essential part of his or her injury." Such a standard, for example, requires only a criminal act directly related to the cause of action and does not require conviction.

refused to answer the most basic discovery questions about drug sources and providers. My dissenting colleagues take every opportunity to portray plaintiffs as criminals who are attempting to use our judicial system to profit from the negative consequences of their conduct. In other words, plaintiffs are bad people.

On the other hand, plaintiffs argue that defendants are, at best, profiting greatly from the drug problem of southern West Virginia by, at best, keeping their heads in the sand, and, at worst, being nothing more than drug dealers or pushers who just happen to have the letters "M.D.," "Inc.," or the like after their names. In other words, defendants are bad people.

One can easily understand the intuitive response simply to proclaim a pox on all of the parties' houses in this case and lock the courthouse door. In his dissent, Justice Loughry observes that there may well be no innocent victims here. Perhaps not. But I am also troubled that despite their own alleged bad acts, including criminal misconduct, defendants now seek to use the very same justice system they would deny to plaintiffs to shield themselves from such claims. How ironic it is that defendants claim a right for themselves that they would deny to plaintiffs.

I am disturbed by the contention that this case can proceed beyond discovery if the plaintiffs are permitted to use their Fifth Amendment right offensively to avoid self-incrimination to thwart defendants below from fully discovering their case. Questions related to the source and types of drugs used by plaintiffs would seem to be related directly to proximate causation and damages. By commencing this action seeking damages related to the use of drugs, plaintiffs have submitted themselves to the jurisdiction of the court and West Virginia's Rules of Civil Procedure. It is hard to fathom how plaintiffs have not put their drug use, regardless of source, into issue. As such, they should be compelled either to waive their Fifth Amendment privilege against self-incrimination and respond to discovery procedures, or have their complaint(s) dismissed. The privilege against self-incrimination was intended as a shield, not a sword. Otherwise, a plaintiff could use the Fifth Amendment to harass a defendant and thwart any attempt by the defendant to properly obtain evidence by which to necessary defend itself. *See generally, Galante v. Steel Nat'l. Bank of Chicago*, 66 Ill.App.3d 476, 481, 23 Ill.Dec. 421, 384 N.E.2d 57, 61 (1978); *Christenson v. Christenson*, 281 Minn. 507, 162 N.W.2d 194 (1968); *Annest v. Annest*, 49 Wash.2d 62, 298 P.2d 483 (1956); *Franklin v. Franklin*, 365 Mo. 442, 283 S.W.2d 483 (1955); *Lyons v. Johnson*, 415 F.2d 540 (9th Cir.1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970); *Brown v. Ames*, 346 F.Supp. 1176 (D.C.Minn., 1972); *Kisting v. Westchester Fire Ins. Co.*, 290 F.Supp. 141 (D.C.Wis., 1968), *aff'd*, 416 F.2d 967 (7th Cir.1969); *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. 266 (S.D.N.Y., 1958), *Stockham v. Stockham*, 168 So.2d 320 (Fla. 1964).

At the end of the day, plaintiffs must be able to show that defendants proximately caused their claimed injuries. I am not sure that is possible. Plaintiffs are seeking damages on the ground that the defendants caused them to become addicted to narcotic pain medication. If a medical provider did "hook" an otherwise innocent victim of a car or work-related accident onto drugs by his or her wrongful acts, a plaintiff may have a case. However, defendants contend that many of the plaintiffs herein were "doctor shopping," "self-medicating," and worse. Plaintiffs may not avoid focus on themselves as the cause of their maladies simply because some or all of the defendants engaged in bad acts too. Plaintiffs must show proximate causation.

Defendants below contend that there are sufficient "punishment" mechanisms in the law outside of the civil justice system to adequately sanction the defendants for any alleged misconduct in which they may have engaged. In other words, the criminal justice system and administrative licensing boards are available to punish defendants, so affording civil immunity to such defendants is acceptable.

While I find this to be a novel argument, it fails to take into account the purpose of the

civil justice system. Here, plaintiffs seek to pursue their claims for their alleged injuries related to the tortious conduct of the defendants. The criminal justice system is not a replacement for the civil justice system. Nor are administrative licensing boards. While each system may punish a bad doctor or protect future West Virginians from such a bad doctor, they are not designed to remedy the harm allegedly done by a doctor or pharmacist to an individual. For example, the victim of a bad lawyer may still pursue a civil action against the lawyer despite the lawyer be disbarred and prosecuted by the State. The civil action is the right of the individual.

Counsel also suggested that this Court's failure to adopt the expansive wrongful conduct rule sought by defendants would cause insurance rates to rise. This is an argument to be raised with the legislature and presumably was considered by the legislature in enacting H.B. 2002 in 2015. Certainly, a more expansive rule would result in fewer claims which could be made. On the other hand, the legislature must also worry that too expansive a rule would simply allow bad actors to hide behind the rule, thereby potentially hurting West Virginia citizens. Ultimately, this is a policy matter best left to the legislature.